The last case is Ryder v. Oxy, 2531-42. Mr. Seeley, whenever you're ready. No rush. Are you going to quote Ecclesiastes and Pete Seeger about it? Yes. Okay, good. Maybe revelations. David Seeley, may it please the court, on behalf of the appellant royalty owners and the putative class, I'm going to try to reserve a few minutes for rebuttal of my eloquent opponent. This case arises from Merit's deliberate failure to honor uniform limits on deductions from royalty payments for natural gas set forth in a previous class action settlement that Merit inherited from Oxy. I'm sorry. Is that better, Your Honor? Yes. Do you want me to reintroduce myself? Yeah, why don't you start over? Okay, I will, Your Honor. Thank you. May it please the court. I'm David Seeley on behalf of the appellant royalty owners and the putative class. This case arises from Merit's deliberate failure to honor the uniform limits on deductions from royalty payments for natural gas set forth in a previous class action settlement that Merit inherited from Oxy, but which Merit consciously decided to disregard. Thus, unlike most other class action royalty cases, this case does not involve a variety of differing provisions in hundreds or thousands of individual oil and gas leases, which can make class certification in those cases challenging. Instead, it involves a single common contract that clearly states that it is binding on Oxy's successors and assigns and imposes clear limits on deductions from royalty payments. And because Merit made, adopted, and followed a single uniform corporate policy decision, every single royalty payee defined in this class has been subjected to the very same type of deductions that are capped and prohibited by the settlement in the previous case called Littell. But we are here today because at the defendant's urging, the district court applied an incorrect standard for class certification, and it misapplied and failed to rigorously analyze each Rule 23 factor individually, and in light of the many admissions made by the defendants and their witnesses. Those admissions include, during the negotiations for the sale of Oxy's leases and other assets, Oxy told Merit about the Littell settlement and how and to whom it was paying royalties under that settlement. Merit then made the deliberate choice not to honor the royalty payment terms of the settlement that Oxy had been fulfilling since 2008. Merit did not tell the royalty owners that it inherited from Oxy that it would start taking deductions that were capped and prohibited by the Littell settlement. But in an attempt to avoid liability here, defendants have resisted certification on the ground that they do not have sufficient information to identify and pay what is owed to members of the putative class who have been shortchanged by Merit's action and Oxy's inaction, even though the defendants have continually relied on their own records and business practices to do exactly that each and every month since those assets were sold. Defendant's expert, Angela Paslay, identified 5,416 payees on Wells Merit acquired from Oxy during the class period. Each of those payees has been regularly paid by Merit, and 1,932 of them are original participating class members in the Littell case who are still receiving payments from Merit, as they have for many years. Now, the expert didn't say that, though. No, she did not say that. Well, not in so many words, Your Honor. She said these are people that Merit has been paying. Their payees and these 1,932 are also original class members in the Littell case. Because that 5,000 plus interest owners would have included, presumably, some of the interest owners in some of the couple hundred wells that were drilled in the Hugaton field after the sale from Oxy to Merit and after 2017, the beginning of your class period. If I'm understanding your question, Your Honor, I think the simple answer is that the drilling of a new well doesn't change the ownership of the interest. Right. It's still the same property. Right. I understand that. It's the same property, but those, let's say, I'm not, but let's say I'm one of those guys, and my interest is in one of those new wells that was going to be south of the, what is it, the Panama? Panama. What is it? Panama, Council Grove. Yeah, a field. And so it was going to be below the ceiling that was going to be outside of the class. Your Honor, we would disagree with that. Nothing in the settlement agreement limits the royalty payment provisions to either existing wells or to wells of a certain depth. It encompasses all the wells and all the gas produced. So I did not get that from the brief, so this is helpful. So you're representing that the settlement agreement included interest owners that had an interest in the gas above and below that, what you said, Panama?  Yes. Yes. We'll just call it the dividing line. I think at that time there were, I'm not aware of any wells that were drilled below the base of the Panama. I think those are the new wells that we're talking about. At the time of the Littel settlement, the production was in the. . . The question is what the settlement agreement said. Okay. I mean, the settlement agreement, you're representing that the settlement agreement included interest owners in oxy wells that were not segregated based on the depth of the gas that was being drilled. In the sense, Your Honor, that those are the same owners of the leaseholds on which those deeper wells or newer wells were drilled. Well, yeah, I guess it is probably my fault. I apologize for being. . . No, no, no, don't apologize. I apologize to you. But I understand what you're saying is you have an interest in the field whether or not it was subject to an existing well or not. My question is if, let's say, this is the dividing line and the settlement agreement included interest owners and their only entitlement under the settlement agreement was for the drilling of gas that was, say, above that dividing line and then the new gas wells drilled below that dividing line. Well, obviously, if I am one of those people and I acquire an interest in a new well in a field that was covered by the old settlement agreement but did not cover that gas at the same depth that was encompassed in the settlement agreement, the interest owners of the new gas wells would not have been beneficiaries under the settlement agreement. Again, Your Honor, from the royalty owner perspective, the payment obligation goes to the leasehold. So any well drilled on the leasehold is subject to the royalty payment obligation. And the fact that it's a new well or a deeper well doesn't change that ownership. And I'm not aware of anyone who's attempted to change the royalty ownership based on the depth of the well. Counsel, we have said that the district court in making its decision on certification has a fact-intensive duty to apply the Rule 23 factors. My understanding from the record in this case, though, that may be part of the challenge the district court faced is the deputative class didn't marshal a lot of evidence. It didn't present any experts. There was no damages model that would have been helpful for predominance. And, in fact, I think it may have been said in the response it didn't take any depositions. So it seems to be a marshaling of evidence by one side but not the other. Well, I guess the short answer to it, Your Honor, is our case is very simple. There's a single contract. It was breached uniformly across the board of all the payees who were Littell-class settlement members or their successors. And the records, including the check stubs, I guess I would make one editorial comment here. If you're going to look at one thing in the record, look at the check stub. Because it makes it clear that Oxy has information about which well, which property, what the name of it is they're paying for. And it also makes it clear that they're treating all these payees who get these royalty checks as owners because it says owner on the check. Well, but the district court didn't see it that simply, obviously. And I'm going to get to why you may think that was there. And I'm going to predict it's going to have something to do with administrative feasibility. Yes, the. What your position is. I'm sorry. The merit was paying royalties during the whole period that Oxy had previously paid. Except they were not following the agreement, the settlement agreement. It has nothing to do with new ownership coming in. Correct. That's correct, Your Honor. The same people that Oxy paid are being paid by merit. Right. Subject to subsequent transfers of the ownership. Which these defendants, Oxy first, vetted everybody that they decided to pay royalty to. They asked them for evidence of ownership. It may have been the party to an original lease. It may have been someone who inherited the royalty interest under a lease. And with that said, merit then had the opportunity to vet each and every subsequent royalty owner. Who presented themselves or who they were referred to. To ask them to provide their evidence of ownership. Which merit then considered. And they do this in their division order department. And Ms. Drennan ran. And they make the determination of whether that person has demonstrated ownership sufficient to be put in payee status. In other words, they don't get a dime until merit is convinced that they are lawfully entitled to receive this money. They're not giving it to people off the streets. They're giving it to people who can show that they inherited it from Grandpa Joe or whatever. And that fact, we tried to let the district court know that. But the district court seemingly ignored it. And the district court ignored these other admissions that the defendants have made. For example, Mary Drennan, who manages the division order department, admitted that her department is charged with handling issues that arise regarding ownership. And that merit can only identify names of royalty payees that merit is currently paying or has paid royalties for production from lease properties and wells acquired from Oxy. So merit knows which leasehold properties and wells it acquired from Oxy and who it pays. And those properties and wells are named on those check stubs. And merit relied and followed Oxy's ownership information regarding the identity of the proper royalty payees, the royalty owners. And merit decided it was not necessary to corroborate that information. Ms. Drennan also admitted that if merit has any doubt about whether it has correct ownership information, it puts the proceeds in suspense until the issue is resolved. And once it resolves the issue, merit places the correct payee into pay status and they start making payments to them. But absent such doubt, merit continues to pay them royalties because there is no legitimate question regarding ownership. There's no evidence that someone else owns the royalty interest. It's important to note, it's not the plaintiff's fault that merit made the deliberate decision to disregard the Littel settlement and ignore its requirements. It's not the plaintiff's fault that merit chose not to keep track of which former royalty owners were subject to the Littel settlement. It is not plaintiff's fault that Oxy did not require merit to honor the Littel settlement in order to ensure that the obligations to the participating class members and their successors were satisfied. It is not the plaintiff's fault that merit chose to keep inadequate, incomplete, and or disorganized records regarding leases, regarding ownership, and the improper deductions that it decided to take contrary to the Littel settlement. All of those things are the fault of the defendants themselves. But it is the defendants who are asking the courts to relieve them of the consequences of their own acts, omissions, and record keeping or lack thereof. The defendants have created a problem and then blame that problem for why the class can't possibly be certified. And this, the district court's holding in this case is truly unprecedented. After three rounds of briefing, the defendants still have not cited a case other than one involving a dispute of ownership of coal and related gas, in which any court has held that a class of royalty owner payees could not be certified until their ownership was self-evident or easily established. There are no conventional gas cases doing what this judge did in holding that ownership must be proven in order to bring the class. The issue of ownership became the tail that wagged the dog, at least in the district court's view. You're 30 seconds over time, but I am going to let you wrap up. I would like to wrap up. You betcha. This is not quiet title action. Even in a quiet title action, there must be an actual good faith dispute between competing interests, and the parties must present their evidence of ownership to the court. Here there are no competing claims of ownership. Ownership is at very most a secondary issue that should not even arise unless and until there is good reason to doubt the defendant's own determinations that specific members of the proposed class are the owners of the royalty interest entitled to receive payment. And the Klein versus Sunoco case not only lays to rest the notion of administrative feasibility as the standard for ascertainability, it also provides a good roadmap of how the court should examine and scrutinize the defenses that these producers are using in case after case. In fact, there's even common counsel here. When I said wrap up, I didn't mean start a new argument.  But I will let you truly wrap up now.  Yes, Your Honor. I guess what I would say in summary is that we are not trying to make these people payees or owners. They are already payees and owners. And the defendants determined that. They made them payees after vetting them and considering their evidence of ownership. And for all these reasons, and for the fact that the district court basically ignored all of the evidence in the form of the experts and Ms. Drennan that was contrary to Merritt's position and Belay's Merritt's position, we would ask for reversal and remand with instructions to certify the class as defined in our motion for class certification. Thank you. Judge Kelly, do you have any questions? No. Thank you very much. Thank you, counsel. We'll hear from the appellant. Good morning. My name is Dan McClure. I'm here to argue on behalf of both Merritt Energy and Oxy. You know, the cornerstone of this court's jurisprudence on class certification has always been that there's broad discretion in the trial court, the district court, and it shouldn't be disturbed unless there's a clear abuse of discretion. Here, that's the district court made a careful analysis, a rigorous analysis on a comprehensive record. Counsel. Yes. Let me interrupt. Sure. Did Merritt acquire properties from Oxy? Yes. Did they acquire properties from Oxy? And did they pay royalties to the people that Oxy said you have to pay royalties to on those properties? Yes. It's not a hard question. Okay. So what is the issue about not knowing who the people are that you pay royalties to every month? You know who they are. You send them a check every month. And the question becomes, do you have to pay them the extra that resulted from Oxy's settlement? That's the only question. And you say that you don't really know who they are. But they're the same people you pay royalties to every single month, 5,416 of them. Well, the short answer, Judge Kelly, is that the only persons of the 5,000 that we pay who have a right to sue for the breach of the settlement agreement are the ones who were either Littel class members at the time in 2008 or their direct successors in interest. If there are other acquisitions and other people being paid for other reasons on new wells, deeper wells, other acquisitions from other companies that include interest in those wells, those people don't have standing to sue for that breach of settlement agreement. Yes. Yes. Yes. We got that. I think what is unique about this case, though, is critical for the court to understand, is that we're not just talking about a standard royalty case where the class is, whoever you've been paying, that's who you owe the duty to. Here, the duty, the cause of action for breach of the settlement agreement, that's all this case is about is the breach of the settlement agreement. The only persons who can bring that claim are not just everybody we're paying right now, which are 5,000 plus, actually, but the 2,000 or less, possibly, who had membership in that Littel class, even if you could identify who they were and their direct successors and interests. And what the record shows, and what the court relied upon in particular, is that we pay many people who are not Littel class members. More than 3,000 of the 5,000 are not on the class list that they sent to the court at all. So what about those 3,000? You know who they were. Yes. You know who the people are entitled to money. No, we don't. And you can suspend, you can put into suspense any that you have issues with. But I think- I don't know if you've been in the oil business for a long time, but I have been. And you can suspend them without any of your sayings or buts if you have a doubt. Yes, if we have a doubt about the current ownership. But even those people who are currently entitled to be paid royalties may not be people who have a right to sue for breach of the settlement agreement that was entered in 2008 because they weren't members of the Littel class or their direct successors and interests. When we acquire, drill a new well, we may have a new lease. We may have a new lease with the same people or different people. We acquired those wells from Oxy2. There's over 500 such wells. And those people don't necessarily have a right to sue for breach of that Littel settlement agreement. That's what's so unique here is the need to trace the title of the current 5,000 payees back to one of those original Littel class members because if they don't retrace, if they're not either a Littel class member or a successor and interest, that's the only people who have a right to sue for breach of that settlement agreement, that's section 2.4 to 2.6 of the settlement agreement. Not just everybody we happen to pay. Counsel, this argument you're making, you keep saying it's unique, but it doesn't sound very unique to me. I mean, we have cases where defendants are contesting class certification, basically making the same point you're making here, which is we're not able to ascertain who these people are without doing individual title searches. I've heard that argument before. Whether it's tied to the class settlement or it's tied to some type of ownership interest that originates in some title transfer at some point in the past, you know, again, that argument's fairly common. So you started by saying that certification decisions are really, there's a lot of deference given to the district court, and your supplemental brief says this, and I think that's right. But when Judge Rattle wrote her order here, her first point is to take on this argument you're making, and she says, well, ascertainability, the Tenth Circuit has said that that's something that I must consider. It has not provided guidance on what that means. And, in fact, she looked to the Third Circuit, the Seventh Circuit. You know where this is going. Of course, the Tenth Circuit now has said what that means, and Judge Rattle said it wasn't administratively feasible. Why shouldn't we say, well, we're going to give Judge Rattle a lot of deference here, but she has to use the right legal standard? Why shouldn't we remand for her to apply a decision that, again, she didn't have when she made her order, and to see how she comes out at that point? Well, I believe that you can do that without sending it back to her, because the Sunoco case, which I know you wrote the opinion, Judge Frerico, did not say that a court could not deny a class based upon it using its discretion to find that administrative feasibility made the class either not superior or not ascertainable. The Sunoco case did not overrule the Duval case, which, or for that matter, the Evans v. BYU unpublished case just three years ago, which held that judges have the discretion to use that as a factor to deny class certification, even if it's not a requirement that will trump it. Well, I would agree with you it didn't overrule Duval because it didn't have to. I mean, I think your supplemental brief, and I understand you have a motion for us to even grant you to file it, but I've read it, and so I want to talk about it. It relies pretty heavily on one sentence in Duval, but Duval doesn't even use the word ascertainability. I don't think it cites the Rule 23, so I think you may be providing a lot of weight on one sentence in that opinion, but Klein cites Duval favorably, and I think we would agree that administrative feasibility is something that can be considered. But, as you were just saying, is it allowed now post-Klein v. Seneco for the district court to say, well, it's not administratively feasible, therefore, I'm now going to apply that factor alone to deny class certification under the numerosity factor? Well, as you say, Klein did not, Klein v. Seneco did not overrule the Duval case, and it was certainly interpreted in the Evans v. BYU case as holding that administrative feasibility, you know, is a factor to consider when you determine ascertainability. And I think she did that, and her discretion and her extensive review of the record would support that exercise of discretion in denying a class certification. Seneco, of course, entirely different factual and legal situation, and was a full trial, and there you're merely affirming a grant of class certification. But keep in mind also that the same kind of facts that form the basis of her ascertainability analysis also strongly support the predominance finding, and she referred back to the title tracing problems when she was dealing with the predominance problems. And really, the court, after all, the district court, denied class certifications on multiple alternative grounds. Ascertainability, yes, commonality, predominance, typicality, adequacy, and superiority. This court can affirm on any of those grounds, and I would actually submit to you that the predominance argument, the predominance ground is the easiest one to affirm on, on the record, which is extensive, and which tracks what she said in her ascertainability part of the opinion. And the court can affirm on that basis. To obtain reversal, after all, the plaintiff should have to show that her fact findings were clearly erroneous with respect to every one of those alternative grounds. And for this court to reverse, even if you disagree with the court's analysis or question her analysis about ascertainability, can easily affirm on predominance grounds. And those predominance grounds are multiple. There's not just the title tracing issue. There's also the damages and underpayment issue. Well, but the district court didn't even find any common questions to know whether they predominate at all. And so one of the arguments I heard your counterpart make about predominance was that, really, this is sort of the same common scheme or policy that was enacted now by merits. And, of course, again, we talk about that in the Klein decision as well. So why shouldn't we view it that way? Well, it's only a common question for people who have a standing to sue for breach of the settlement agreement. For people who weren't parties to the settlement agreement or their direct successors in interest, it's not a common question, and that was what her thinking was on it. But I think it's easier to look at it in terms of predominance. There are huge problems with title tracing, with the acquisition of new wells, with units. I know Judge Kelly asked about, don't you know who you pay? Yes, but who we pay includes a whole lot of people who don't have standing to sue for breach of the settlement agreement. Can you address what the appellants have argued about these 200 other wells from your perspective? And, in particular, I'm assimilating what the appellants have said with regard to your argument that at least some of the interest owners in the 200 or so additional wells were interest owners in gas that went below the Ponoma Council growth field. Now, as I understand their argument is, well, those will all be included in the Littel Settlement Agreement. Well, my quick response to that is to look at Volume 1, page 41, which is the definition of the Littel Settlement Class. The Littel Settlement Class were persons owning interests in lands burdened by leases owned by the defendant with respect to gas production from above the base of the Ponoma Council growth field. All right? So if there's a new well, and the new well is deeper than that, a deeper well, as many, many of them were, and we're talking about 700 wells that have been drilled by Oxy and Merit since 2008. If those wells are deeper, then that person would not be a member of the Littel Settlement Class, and there would be no breach of the Settlement Agreement. That's my answer to that. I hope that's clear. But there are unitization issues. There are a lot of, most of the people paid by Merit now. We know who we pay, but we don't know that those 3,000 link back like an archaeological search to the people who have a standing to sue in the case. And under that circumstance, they deliberately made this class definition overbroad because their first class definition was defined as, in this case, persons who were Littel Class members or their direct successors in interest because that's all that anybody has a standing to sue under the agreement. We said, oh, there's all these title tracing issues, and there's all these other issues, and there's new wells, et cetera, and they said, well, okay, then we'll just redo this class definition and say, well, it's anybody you pay. And as Judge Kelly says, we know who we pay, but trying to eliminate that ascertainability problem, they've created a huge predominance problem, and they don't have any record. They just said, this is such an easy case. We don't need to take any depositions. We don't need to present any evidence. We're not going to present any experts. We're just going to disparage what the vast and detailed and very direct record is that my client produced. And then they would cherry-pick certain things from the record. Mr. Seeley read part of the sentence of Ms. Drennan's testimony, Volume 2, Page 201, that Merit knows who it's currently paying royalties on wells acquired from Oxy. He didn't read the rest of the sentence, though, which he said, but those royalty pays in those properties include some royalty pays and payments where Merit's interest in the property well was not derived from the Oxy acquisition, but from some other acquisition, direct leasing by Merit or unleased or unknown mineral owners. Merit cannot identify or tie its royalty payees to specific royalty, oil and gas lease interest payments acquired from Oxy. The royalty payees for production from wells acquired from Oxy may include more than just former Oxy royalty owners. And what we learned from Oxy, in which she said, is that Oxy didn't try to do that. They just paid everybody the same on this $0.15 cap across the board, so that just who they're paying doesn't help us know who it was that was entitled to be a claim for breach of contract under the settlement agreement. And the court carefully looked at that evidence. The record fully supports the denial of class certification on predominance grounds, as well as the others that we've raised. And we respectfully submit that the court should defer to the judgment of the trial court. There were no clear error. There was no contrary evidence, and affirm her denial of class certification. Do you have any questions? Judge Kelley, do you have any questions? No, thank you. Okay, I'm going to give you one minute. Thank you, Your Honor. Thank you. Just a few brief points. Why is Merritt paying these people if they don't own the interest? No explanation. They've already determined they own the interest. Administrative feasibility, if it's not tied to numerosity, as it wasn't here, has no place in the analysis of the Rule 23a factors. It could only come into effect with respect to, I think the court in Klein suggested, the manageability component of superiority. And Klein makes it very clear that it is not to be a trump card, that it doesn't outweigh anything else. The other thing is that when you're looking at manageability, you have to consider, which the district court did not do, the role of discovery and summary judgment in identifying, are there really any issues about ownership? They haven't identified any individual payees that they say don't own their interest. They just say, well, it might be. We don't know for sure. We can never know with absolute certainty because somebody might have assigned their interest yesterday, and we wouldn't know about it until that person who wants to be paid the royalty interest comes in and tells us. All of these things, Your Honor, the practicalities and the actual conduct of Merit's business operations and how they vet payees by looking at evidence of ownership cannot just be set aside and ignored as the district court did. It has to be given credit, and it undermines Merit's credibility when on their royalty statements they have information about which well this person is being paid for, what the name of that well is. They have information about the deductions that they've taken every month. You're down two minutes, so you really need to wrap up. Thank you, Your Honor. I appreciate the patience of the court. And the last thing I'd say is that there is still no evidence that ownership is different. Ownership of royalty interest is any different for a deep well than for an ordinary well. The lease generally runs to all debts. There's no evidence here of leases that are restricted and have different ownership at different debts. It's another red herring. We've tried to identify those in our brief, and we ask the court to take that into consideration. Thank you. Thank you, counsel. Kevin, are there arguments tomorrow at 8.30? 8.30. Okay. Thank you very much, counsel. This matter is submitted. Again, I want to compliment counsel for both sides. I thought both sides did an excellent argument in your briefing.